Filed 5/2/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br><br>ALBERTO LOPEZ-BARRAZA,<br><br>　　　Defendant and Appellant. | A168604<br><br>(Sonoma County<br>　Super. Ct. No. SCR6089833) |

Alberto Lopez-Barraza was convicted of robbery and murder in connection with the 2011 murder of Jose Manuel de Jesus, but acquitted of conspiracy to commit robbery. Now appealing from the denial of a Penal Code[1] section 1172.6 petition for resentencing, he contends the trial court impermissibly relied on factual findings that conflicted with the jury's determination that he was not guilty of conspiracy. We agree and will remand for a new evidentiary hearing.

---

[1] All statutory references are to the Penal Code.

# BACKGROUND

## I.

### *Procedural Background*

Lopez-Barraza was charged, along with codefendants Fernando Lopez-Castillo (Fernando)[2] and Jose Carraballo-Mejias (Mejias),[3] with murder (§ 187, subd. (a)), conspiracy to commit robbery (§§ 182, subd. (a)(1), 211) and robbery (§ 211), with allegations including that the murder was committed while the three codefendants were engaged in the commission of a robbery (§ 190.2, subd. (a)(17)), that Fernando personally used and discharged a firearm (§ 12022.53, subds. (b), (c) & (d)) and that a principal was armed with a firearm (§ 12022, subd. (a)(1).)  Lopez-Barraza and Mejias were tried jointly, but with separate juries.  (*People v. Lopez-Barraza* (Feb. 16, 2017, A138550) [nonpub. opn.])  Lopez-Barraza's jury found him guilty of murder and robbery and found the robbery special circumstance true, but found him not guilty of conspiracy to commit robbery.  We affirmed the murder and robbery convictions but reversed the special circumstance finding for instructional error.  (*People v. Lopez-Barraza* (Feb. 16, 2017, A138550) [nonpub. opn.].)  On remand, the People elected not to retry the special

---

[2]  Fernando is the brother of another participant in these events, Juan Ramon Lopez-Castillo (Ramon).  We refer to the brothers by first name in the interest of clarity and mean no disrespect by doing so.

[3]  As Carraballo-Mejias was referred to as Mejias throughout the trial court proceedings, we continue to so refer to him.

circumstance and Lopez-Barraza was resentenced to a prison term of 25 years to life plus one year.

In 2019, Lopez-Barraza filed a petition for resentencing pursuant to section 1172.6.[4] The court appointed counsel and subsequently issued an order to show cause. An evidentiary hearing was held on April 27 and 28, 2023, at which the parties relied on the record of the trial proceedings without presenting new evidence.

On June 9, 2023, the court filed its decision denying the petition.

Lopez-Barraza filed a timely notice of appeal on July 17, 2023.

## II.

### *Factual Background*

**A. General Background**

On October 6, 2011, the body of Jose Manuel de Jesus was found in the open trunk of a vehicle parked in the parking lot of a butcher shop in Santa Rosa, California. He had died from a single gunshot wound to the head. The bullet found in his head was medium caliber, such as 9-millimeter or .38-caliber, consistent with a ".38 Super."

Investigation led the police to Elias Alfaro, who told them about a meeting he arranged for his friend de Jesus, who wanted to sell marijuana, and Ramon, who might want to buy it. At trial, Alfaro testified that a day or two before the homicide he and de Jesus met with Ramon and Mejias at a Starbucks on Sebastopol Road and discussed a possible sale, after which de

---

[4] At the time, the governing statute was numbered section 1170.95, but it was renumbered section 1172.6 effective June 30, 2022, with no change in the text. (*People v. Lopez* (2023) 88 Cal.App.5th 566, 570, fn. 2.) We refer to the current statute number for clarity.

Jesus and Ramon confirmed the details and agreed to meet at Carniceria Contreras, a butcher shop where Ramon used to work.

Cell phone data showed calls on October 4 to 6 between Alfaro and Ramon and between Ramon, Fernando, Mejias and Lopez-Barraza. On October 5, phones belonging to Lopez-Barraza, Alfaro and Ramon connected to cell towers near the Starbucks where the initial meeting took place. On October 6, 2011, there were several calls between Lopez-Barraza's phone and Ramon's, and the phones belonging to Fernando and Lopez-Barraza connected to towers consistent with them being at Carniceria Contreras around the time of the shooting.

During the investigation following the homicide, two firearms were found in the brush on the side of a road near the butcher shop, one of which, a Llama ".38 super" caliber pistol, was the weapon used to fire the shot that killed de Jesus. Ramon's and Fernando's phones were found by the side of the road.

### B. Velasquez Testimony

Anna Velasquez, who was Fernando's girlfriend at the time of the offenses, testified under a grant of immunity. She had pleaded guilty to being an accessory after the fact, was on probation at the time of trial and acknowledged that she had lied to the police in this case to protect Fernando, as well in the past.[5] At the time of the shooting, she had been using methamphetamine daily for five or six years and that day she had been smoking it on and off all day, but she was no longer using it at the time of trial.

---

[5] Velasquez had been convicted of giving a false name to a police officer in 2006 and in 2011, falsely told a police officer that she had been driving a car that her then-boyfriend crashed while driving drunk.

Lopez-Barraza is the first cousin of Fernando and Ramon. At the time of the shooting, Velasquez and Fernando lived in Petaluma in a rented room where Lopez-Barraza's brother Fortino was also living. Lopez-Barraza lived in Hayward but visited in Petaluma.

During the few days before October 6, Lopez-Barraza was around more consistently but left at night. Early on the morning of October 5, Lopez-Barraza and Ramon came to the place where Velasquez and Fernando were living, and Velasquez, Fernando and Lopez-Barraza smoked methamphetamine while Ramon was on the phone outside. Ramon came in and said something like, " 'We have to go fix everything for tomorrow.' "[6] The three men left while Velasquez was taking a shower, then returned after a few hours. Lopez-Barraza and Ramon later left in the car Ramon was driving at the time, a black Cadillac, and returned early the following morning. They smoked methamphetamine, then Ramon told Fernando they had to go. Velasquez saw the three men loading guns, which they put in their waistbands, covered by their shirts, when they left that morning. Velasquez testified that she had seen all of them with guns before and identified the gun used to shoot de Jesus as the 9-millimeter she had seen Fernando with that day and "many times" before.[7]

Fernando told Velasquez they were going "to work," which she understood from prior occasions to mean going to "get marijuana from people." She heard Ramon say they had to pick up "Cuba," referring to

---

[6] Velasquez testified that she had overheard a telephone call to Ramon from his brother-in-law, Jesus Sanchez Bastidas, telling him to "get ready," after which Ramon told Fernando they had to "go meet the guy" and "[m]ake sure everything was ready for the next day."

[7] She testified that Lopez-Barraza had a nine millimeter and Ramon had a silver Smith and Wesson with a picture of Santa Muerte on the grip.

Mejias. The men were gone all day. That evening, Velasquez called Lopez-Barraza because she had been unable to reach Fernando and he told her " 'something went wrong' "; Fernando was with him and told her to get their belongings together. He picked her up in a green van with Lopez-Barraza, Mejias and an "old guy" she did not know driving. Ramon was not there.

After dropping Mejias off, the group went to Lopez-Barraza's house in Hayward, then went to a motel where Lopez-Barraza rented one room for Velasquez and Fernando and another for himself and his girlfriend. It was later established that he did so using the name Juan Carlos Isiordia. Velasquez testified that the next day, Lopez-Barraza dropped the van off with Ramon's wife and he, Velasquez and Fernando went to get Fernando a new cell phone.

When subsequently arrested, Velasquez gave false statements to the police. When she spoke with the prosecutor some 10 months later, she told the truth. At that time, she said Lopez-Barraza did not know about the robbery and, when asked if Ramon and Fernando talked about stealing the drugs in front of Lopez-Barraza, she responded, " '[t]hat's a good question.' "

Velasquez described a robbery Fernando and Ramon committed in her presence a few weeks before the homicide during which, while the person they had arranged to buy drugs from was in the back seat of their car, Fernando beat his head with Fernando's gun as Ramon held the car door closed. Velasquez heard Fernando and Ramon discuss the incident in front of Lopez-Barraza, who responded, " 'Oh my god, you guys are crazy.' " Fernando and Ramon also discussed in front of Lopez-Barraza an incident in which Velasquez and Fernando stole a half kilo of methamphetamine from her godfather and Fernando, trying to teach Velasquez "how to control someone,"

6

shot the back seat of the car, where her godfather was sitting. Again, Lopez-Barraza said they were crazy.

## C. Lopez-Barraza's Statements to the Police

Sergeant Carlos Basurto interviewed Lopez-Barraza after his arrest. Lopez-Barraza had identification in the name of Juan Carlos Isiordia, which he told Basurto was false identification he had obtained because he feared deportation, and thought he was being arrested due to his immigration status.

Lopez-Barraza initially denied ever being at Carniceria Contreras, telling Basurto that Ramon had picked him up in Hayward on October 6 for a visit in Santa Rosa and to retrieve Fortino's belongings, as Fortino had recently been deported.[8] Eventually, he told Basurto he was at the scene, saying they had gone for a ride and just ended up there. He said that another car arrived at the same time, Ramon told him to grab some boxes from the trunk of the other car and as he was walking with one of the boxes, he heard a gun fire. He saw Fernando holding a gun and Fernando said, " 'I killed him.' " They left and drove to Hayward, where Ramon dropped him at his house. Later that evening Fernando and his girlfriend came to the house and Lopez-Barraza took them to a motel where he rented a room for them and one for himself and another girl. Lopez-Barraza said he did not see anything being thrown from the car after the shooting and did not know what happened to the gun and that he felt he was a victim for being at the scene of the shooting because he had not known where they were going or what was going to happen and was going to be held responsible for something he did not do.

---

[8] The parties stipulated that Fortino was convicted and sentenced on September 27, 2011, of alcohol-related reckless driving.

Basurto interviewed Lopez-Barraza further after interviewing Ramon. Confronted with new information Basurto had obtained, Lopez-Barraza admitted that he and Fernando were hiding behind the building before the victim arrived. He denied knowing they were going to steal the marijuana; he thought they were there to buy or sell marijuana, Fernando told him to wait behind the building and he thought they were hiding there in case there were problems. Lopez-Barraza acknowledged that Mejias was also in the car, which he had not previously mentioned, because he did not want to involve him. To his knowledge Fernando was the only one with a gun, and he did not know that Fernando had one until it went off.

**D. Mejias's Testimony**

Mejias testified that he did not participate in a plan to rob anyone of marijuana, that he had never discussed guns with Ramon, that he did not see any guns when he got in the car with Ramon, Fernando and Lopez-Barraza on October 6, 2011, and that there was no discussion of them being armed or of robbing de Jesus. Mejias acknowledged that he had an extensive criminal history, including convictions for possession of drugs for sale, assault and possession of a weapon, that he had been to prison several times, that he had been using drugs since age 13, and that he had lied to the police about his involvement in this case.

Mejias testified that he worked as an "errand boy" for Jesus Sanchez Bastidas, a drug dealer. On October 5, 2011, Mejias went to Starbuck's with Ramon to look at some marijuana that Mejias thought was part of a large deal Bastidas had told him about. They met Alfaro and de Jesus and sat in de Jesus's car, where Mejias examined the marijuana. Ramon asked about a larger quantity of marijuana. The next day, Ramon picked him up to look at the marijuana with Fernando and Lopez-Barraza in the car.

8

Ramon became agitated when he was unable to contact de Jesus and decided to go to Carniceria Contreras.  There, Ramon told Fernando to go in and say hello to the owners and Fernando and Lopez-Barraza got out of the car.  Mejias asked Ramon to take him home because it did not seem like anything was going to happen, and Ramon told the others to wait while he drove Mejias.  They left but then returned because Ramon said he had reached de Jesus while Mejias was inside a store.  When they got back, Mejias at first did not see Fernando and Lopez-Barraza.  As they pulled into the parking lot at Carniceria Contreras, Ramon was agitated and said he was unable to reach de Jesus again.  They argued when Ramon said he was "going to beat the shit out of de Jesus" and Mejias told him that was not going to happen because it was not what Bastidas wanted.  Ramon called Fernando and Lopez-Barraza over to the car and said something to them in Spanish that meant "get the toys or get the guns."  Fernando and Lopez-Barraza went to the back of the carniceria, and Mejias asked Ramon, " 'What was that for?' "  Ramon said something like, " 'The guy hasn't showed up, and I don't know where his head is . . . ."

Three or four minutes later, de Jesus arrived and parked next to Ramon's car.  De Jesus and Ramon got out, shook hands and talked, then de Jesus took two big boxes out of his car and put them on the ground, one of which Ramon put in the Cadillac.  Mejias, who had stayed in the car with the money, saw de Jesus open the trunk of his car then saw Fernando and Lopez-Barraza walking fast from the back of the building toward de Jesus.  Fernando was holding a gun down at his side, but Mejias could not remember whether Lopez-Barraza had a gun drawn.  As Lopez- Barraza struggled to get a box from the trunk of de Jesus's car, de Jesus turned toward Fernando and they argued.  Fernando pointed the gun at de Jesus and grabbed him, de

9

Jesus tried to slap the gun away, then Fernando pushed de Jesus into the trunk. Ramon, who had gone to pick up the second box, also pushed de Jesus into the trunk, and as the struggle continued, Mejias heard the gun go off. Fernando said, " 'Oh shit, I shot him.' " Everyone started yelling "let's go" and they drove away. "[T]hey" opened the windows and threw the guns, and Mejias threw Ramon's phone out of the car at Ramon's request. They drove to Hayward, where Mejias and Fernando went into Walmart, and when Mejias came out, Ramon, Lopez-Barraza and the Cadillac were gone.

At trial, Mejias was asked about some of his letters and phone calls from jail. These included a letter saying the group went to buy a large quantity of drugs but " 'instead, the dope dealer got robbed' " and another saying that at the end of September he saw Ramon, Fernando and Lopez-Barraza give Bastidas 30 pounds of marijuana and keep two guns. In a call with his girlfriend, Meijas said there were not supposed to be guns and the plan was for the others to beat up the dealer and take the drugs.

## DISCUSSION

Lopez-Barraza was convicted of first-degree murder on a theory of felony murder prior to 2018 legislative changes that "significantly narrowed the scope of the felony-murder rule" and "created a path to relief for defendants who had previously been convicted of murder on a felony-murder theory but who could not have been convicted under the new law." (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*).) Resentencing is available to such defendants if the defendant was not the actual killer; did not, acting with intent to kill, aid and abet the actual killer in committing first degree

10

murder;[9] and was not a major participant in the underlying felony acting with reckless indifference to human life as described in section 190.2. (§ 189, subd. (e)(1)–(3); see § 1172.6.) There is no dispute that Lopez-Barraza was not the actual killer.

The trial court denied resentencing relief under section 1172.6 because it found Lopez-Barraza was a major participant in the offenses and acted with reckless indifference to human life. The court's decision was based in part on its finding that Lopez-Barraza knew about and participated in planning the robbery of de Jesus. As we have said, although Lopez-Barraza was convicted of first degree murder and robbery, the jury found him not guilty of conspiracy to commit robbery. Lopez-Barraza contends the denial of his resentencing petition must be reversed because the trial court's finding that he planned the robbery with the other participants was inconsistent with his acquittal on the conspiracy charge.

## I.

### *The Trial Court's Order*

The trial court decided Lopez-Barraza's petition based on the transcripts and physical evidence from the jury trial; the parties did not offer any new evidence at the evidentiary hearing. (§ 1172.6, subd. (d).) The court analyzed whether Lopez-Barraza was a "major participant" and acted with "reckless indifference to human life" pursuant to factors identified in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th

---

[9] The specific language of section 189, subdivision (e)(2) permits a first degree murder conviction for felony murder if "[t]he person was not the actual killer, but, with the intent to kill, *aided, abetted, counseled, commanded, induced, solicited, requested, or assisted* the actual killer in the commission of murder in the first degree." (Italics added.)

522 (*Clark*) as bearing on these issues in the context of the special circumstance of felony murder (§ 190.2, subd (d).).

*Banks* identified, as considerations relevant to the "major participant" question, the defendant's role in "planning the criminal enterprise" and in "supplying or using lethal weapons"; his awareness of "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; his presence at the scene of the killing, opportunity to facilitate or prevent the actual murder, and personal actions or inaction with respect to the death; and his actions after lethal force was used. (*Banks, supra,* 61 Cal.4th at p. 803.)

Here, discussing each of these considerations in turn, the trial court found that Lopez-Barraza "participated in some fashion at virtually every step of the planning and preparation stages of the armed robbery." Specifically, the court found the evidence supported reasonable inferences that Lopez-Barraza drove Ramon and Mejias to the October 5, 2011 Starbucks meeting with awareness of a plan to rob de Jesus; discussed plans for the robbery in phone calls with his codefendants; was with Ramon and Fernando when they loaded guns before going to meet de Jesus on October 6; possessed a loaded firearm when he hid behind the building with Fernando and knew Fernando and Ramon were armed; and knowingly acted in coordination with the others to complete the armed robbery.

Acknowledging there was no evidence that Lopez-Barraza supplied firearms to others or brandished one himself, the trial court inferred from the evidence that he, Ramon and Fernando loaded firearms "before leaving for the Carniceria to commit a robbery of marijuana," that they each were in possession of a loaded firearm and knew the other two were armed. The court found that armed robbery of a drug dealer carries inherent risks

12

exceeding those of other robberies and that Lopez-Barraza was aware of Fernando's use of violence during prior robberies, and it therefore inferred Lopez-Barraza expected there would be a heightened risk of someone being shot. Regarding Lopez-Barraza's presence and role at the scene of the killing, the court noted that he continued loading marijuana boxes while Fernando was threatening de Jesus with the firearm, took no steps to de-escalate the situation and had not suggested that the group confront de Jesus with unloaded firearms rather than loaded ones. Regarding his actions after use of lethal force, Lopez-Barraza continued to load the marijuana, made no attempt to help de Jesus, fled the scene and was aware that guns were thrown out of the vehicle to hide or dispose of evidence.

The factors *Clark* identified as relevant to whether a defendant acted with reckless indifference to human life " 'significantly overlap' " with those for being a major participant. (*Clark, supra,* 63 Cal.4th at pp. 614-615.) As subsequently summarized in *In re Scroggins* (2020) 9 Cal.5th 667, 677, they include whether the defendant used or knew a gun would be used during the felony; how many weapons were used; whether the defendant was present at the scene; whether the defendant had the opportunity to restrain the crime or aid the victim; the duration of the interaction between perpetrators of the felony and the victim; the defendant's knowledge of the perpetrator's propensity for violence or likelihood of using deadly force; and what efforts the defendant made to minimize risk of violence during the felony.

The trial court's conclusion that Lopez-Barraza acted with reckless indifference to human life was based on inferences that Lopez-Barraza was armed at the scene and knew Fernando and Ramon were armed; took an active role in the robbery by hiding behind the building and emerging with Fernando to surprise de Jesus, loading the boxes of marijuana into the

13

defendants' car, and fleeing with the others; was aware of Fernando's propensity to use significant force and violence in similar situations; and failed to take advantage of opportunities to lessen the risks of the robbery, such as suggesting the use of unloaded firearms or that Fernando not be armed with a loaded firearm in light of his past use of violence, trying to de-escalate the confrontation between Fernando and de Jesus, or providing aid or calling for help when de Jesus was shot. The court noted that the duration of the interaction with de Jesus was brief and the murder did not occur after a long period of restraint.

The trial court rejected Lopez-Barraza's argument that the jury's acquittal on the conspiracy count precluded the court from finding that he actively participated in and assisted in the planning and preparation for an armed robbery. In the court's view, it was precluded only from "formally finding that [Lopez-Barraza] engaged in a criminal conspiracy in violation of Penal Code section 182" and not from making "*any other findings*." Having found that Lopez-Barraza was a major participant in the robbery and acted with reckless indifference to human life, the trial court concluded, beyond a reasonable doubt, that he was guilty of murder under a currently valid theory of felony murder.

## II.

### *Analysis*

Lopez-Barraza contends the trial court's finding that he participated in planning and preparing for the armed robbery conflicted with his acquittal of conspiracy because the acquittal necessarily means the jury found the evidence insufficient to prove he was aware of and agreed to the plan before its commission. The People argue that the acquittal does not have this preclusive effect.

14

## A. Relevant Caselaw

Lopez-Barraza relies on a series of cases holding that jury findings that the defendant did not use a weapon precluded trial courts from denying a section 1172.6 petition based on finding the defendant did use the weapon.[10] The People contend these cases were wrongly decided. The preclusive effect of Lopez-Barraza's acquittal is " 'an issue of law that we independently review.' " (*People v. Arnold* (2023) 93 Cal.App.5th 376, 383 (*Arnold*), quoting *People v. Cooper* (2022) 77 Cal.App.5th 393, 412 (*Cooper*).)

*Cooper* was the first published case to address this issue. *Cooper* held that a jury's acquittal on a count of possession of a firearm by a felon precluded the trial court from finding he was a major participant and acted with reckless indifference to human life based on its belief that he possessed and fired a gun.[11] (*Cooper, supra,* 77 Cal.App.5th at pp. 397-398.) The *Cooper* court declined to adopt the defendant's theory that the doctrine of collateral estoppel required this result, stating it was "not clear whether collateral estoppel principles apply in section [1172.6] proceedings" because "in the criminal context, '[c]ollateral estoppel is traditionally applied to successive prosecutions, and there is 'some question whether [the doctrine] applies to further proceedings in the same litigation.' " (*Id.* at pp. 413, 412.) Instead, it relied on "established case law in the analogous context of

---

[10] Lopez-Barraza argues this issue was not forfeited even if he did not sufficiently raise it in the trial court and, if it is deemed forfeited, defense counsel's failure to raise the issue constituted ineffective assistance of counsel. These arguments are unnecessary and need not be addressed, as the issue was argued and ruled upon by the trial court, and the People do not argue forfeiture.

[11] The parties in *Cooper* stipulated that the defendant was a convicted felon, so the only disputed issue was whether he possessed the firearm. (*Cooper, supra,* 77 Cal.App.5th at p. 399.)

petitions for resentencing under the Three Strikes Reform Act of 2012 (Proposition 36 or the Act)." (*Id.* at p. 413.)

Proposition 36 reduced the punishment for third strike offenses that are not statutorily "defined as serious and/or violent felonies" (§ 1170.126, subd. (e)) and " 'create[d] a procedure by which some inmates already serving third strike sentences [could] seek resentencing' to comport with the initiative's prospective ameliorative effect." (*Cooper, supra,* 77 Cal.App.5th at pp. 412-413, quoting *People v. Arevalo* (2016) 244 Cal.App.4th 836, 841 (*Arevalo*).) Under section 1170.126, a prisoner whose third strike offense was not a serious or violent felony is eligible for resentencing absent specified disqualifying factors. (§ 1170.126, subd. (e).) *Cooper* relied on two cases in which the defendant had been found not guilty of firearm offenses, with not-true findings on arming allegations, but was found ineligible for resentencing based on the trial court's finding that the defendant was armed with a firearm. (*Arevalo,* at pp. 841-842 [possession of a firearm by a felon]; *People v. Piper* (2018) 25 Cal.App.5th 1007, 1010 [several firearm-related counts].) Both cases "held that a trial court could not conclude a defendant was ineligible for resentencing under section 1170.126 by relying on factual determinations about the defendant's gun use that 'turn[ed] acquittals and not-true enhancement findings [at trial] into their opposites.' (*Arevalo*, at p. 853; accord *Piper*, at p. 1015.)" (*Cooper,* at p. 413.)

*Cooper* held that "a trial court cannot deny relief in a section [1172.6] proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Cooper, supra,* 77 Cal.App.5th at p. 398.) Given the jury's finding that the defendant had not been in possession of a firearm, "any evidence he possessed or used a

gun should not have played a role in the [resentencing] court's analysis." (*Id*. at p. 412.)

In finding the analysis of *Arevalo* and *Piper* applicable to section 1172.6 resentencing, *Cooper* discussed the similarity of the two statutory schemes with respect to sentencing and resentencing. *Arevalo* relied on the California Supreme Court's statements in *People v. Johnson* (2015) 61 Cal.4th 674 that the " 'parallel structure' " of Proposition 36's amendments to sentencing and resentencing provisions " 'reflects an intent that sentences imposed on individuals with the same criminal history be the same, regardless of whether they are being sentenced or resentenced' " and " 'appears to contemplate identical sentences in connection with identical criminal histories, unless the trial court concludes that resentencing would pose an unreasonable risk to public safety.' " (*Arevalo, supra,* 244 Cal.App.4th at p. 853, italics omitted, quoting *Johnson,* at pp. 687, 687.) *Cooper* found that the " 'parallel structure' " between resentencing under section 1172.6 and sentencing under the corresponding statutes governing liability for murder (§§ 188, 189) "is even more explicit," providing that a past homicide conviction must be vacated "unless the prosecution can prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under current law, the same standard governing conviction in the first instance." (*Cooper, supra,* 77 Cal.App.5th at p. 415.)

*People v. Henley* (2022) 85 Cal.App.5th 1003 (*Henley*), followed *Cooper.* The defendant had been convicted of murder, two counts of robbery and assault with a firearm, but the jury found not true allegations that she personally used a firearm in connection with the murder and robbery counts. (*Henley,* at p. 1007.) When she subsequently petitioned for resentencing under section 1172.6, the trial court found she was not entitled to relief in

17

part because it concluded she was armed with a firearm.  (*Henley,* at p. 1012.)
Like *Cooper, Henley* found the resentencing court's finding " 'effectively
turned [an] acquittal "into [its] opposite[ ]" [Citations.]' (*Cooper, supra,*
77 Cal.App.5th at p. 417.)" (*Henley,* at p. 1020.)

*Arnold* also reached the same result, holding that the resentencing
court erred in finding the defendant stabbed the murder victim when the jury
had found allegations that he personally used a knife not true.  (*Arnold,
supra,* 93 Cal.App.5th at pp. 379, 387.)  *Arnold,* however, analyzed the
question whether the jury finding was preclusive under collateral estoppel
principles.  (*Id.* at pp. 386-387.)  As *Arnold* observed, subsequent to the
decision in *Cooper,* the California Supreme Court, in *Strong* applied collateral
estoppel principles in analyzing whether a jury's special circumstance finding
that the defendant was a major participant in the charged offense was
preclusive in a section 1170.6 resentencing proceeding.  (*Arnold,* at p. 385;
*Strong, supra,* 13 Cal.5th at p. 715.)[12]  Following the same course, *Arnold*
found that all the requirements for application of collateral estoppel were
satisfied:  The "exact same issue" was considered by the jury and the
resentencing court, the jury "necessarily decided" the issue in finding the
knife use allegation not true; the decision was final and on the merits, the
trial and resentencing proceeding involved identical parties, and applying

---

[12] Subsequently, the Supreme Court again relied on collateral estoppel
principles in *People v. Curiel* (2023) 15 Cal.5th 433, 451 (*Curiel*) in holding
that the resentencing court, considering whether the defendant established a
prima facie case for relief, properly gave preclusive effect to the jury's finding
of intent to kill.  (*Id.* at p. 441.)  The court agreed that preclusive effect was
appropriate on that issue but held that intent to kill was not sufficient to
establish all the elements of the still valid theory of aiding and abetting
murder.  (*Ibid.*)

collateral estoppel would not contravene the doctrine's fundamental principles. (*Arnold,* at p. 387.) *Arnold* noted that the collateral estoppel analysis and *Cooper*'s analysis compelled the same result. (*Arnold,* at p. 385.)

The People do not address *Arnold,* which was decided about five weeks before their brief was filed. The People argue *Cooper* and *Henley* were wrongly decided because the rationale of the Proposition 36 cases these cases relied on does not apply to section 1172.6 proceedings.

According to the People, unlike section 1172.6, the analysis under section 1170.126 " 'necessarily looks backwards' and asks a court to consider on a closed record whether a prior conviction continues to qualify as a strike under section 1170.126. (*People v. Frierson* (2017) 4 Cal.5th 225, 238.)" Because the factors that can disqualify a defendant from relief under section 1170.126, such as firearm use or intent to cause great bodily injury, "may be indistinguishable" from a jury's prior findings in reaching an acquittal or not-true finding, "it would make little sense as a statutory matter to undo a jury's original not-true finding in the context of a section 1170.126 proceeding."

By contrast, the People maintain, a section 1172.6 evidentiary hearing "asks the trial court to consider new evidence and arguments and settle previously unresolved factual issues." The People point out that the parties are permitted to introduce new evidence that the jury did not consider (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952), the prosecution may rely on different theories even if no new evidence is introduced (*People v. Schell* (2022) 84 Cal.App.5th 437, 444-445) and the trial court acts as an independent fact finder. (*Vargas,* at p. 951.)

In the circumstances of this case, we do not find these differences significant. As in *Cooper,* while the parties in this case could have introduced

19

new evidence, they did not do so: The trial court's inferences and fact finding were based on precisely the same evidentiary record as the jury's. Nor did the prosecution offer new theories for Lopez-Barraza's liability or role in the crimes. That the procedures for a section 1172.6 proceeding would have allowed the parties to create a record that differed from the one at trial does not undermine *Cooper's* logic in relying on the section 1170.126 cases. The People ignore the fundamental basis for the *Cooper* court's analogy to those cases—the similarly parallel structure of the sentencing and resentencing provisions in both contexts reflect a legislative intent " 'that sentences imposed on individuals with the same criminal history be the same, regardless of whether they are being sentenced or resentenced.' " (*Cooper, supra,* 77 Cal.App.5th at p. 415, quoting *People v. Johnson*, *supra,* 61 Cal.4th at p. 686.) As *Cooper* observed, the "parallel structure" of section 1172.6 is "even more explicit" than that of section 1172.126. (*Cooper*, at p. 415.) Where, as here, the trial court's independent fact-finding is based entirely on the trial record, the procedural differences the People rely on are not a persuasive basis for disagreeing with *Cooper*.

Moreover, the purpose of section 1172.6 supports the conclusion that "a trial court cannot deny relief in a section [1172.6] proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Cooper, supra,* 77 Cal.App.5th at p. 398.) "The mere filing of a section 1170.95 petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section 1170.95 suggests it was intended to provide redress for allegedly erroneous prior factfinding. . . . The purpose of section 1170.95 is to give defendants the benefit of amended

20

sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947, quoting *People v. Allison* (2020) 55 Cal.App.5th 449, 461, disapproved on other grounds[13] by *Strong, supra,* 13 Cal.5th at p. 718 & fn. 3; *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458 ["Appellant cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict"]; *People v. Flint* (2022) 75 Cal.App.5th 607, 614 ["The prosecution had an opportunity at the original trial to prove that Flint was a major participant in the robbery who acted with reckless indifference to human life. In enacting section 1170.95, subdivision (d)(2) the Legislature has determined that it should not have a second bite at the apple"].)

**B. The Trial Court Erred.**

The present case is not as clear cut as *Cooper, Henley* and *Arnold.* The issue in those cases was the preclusive effect of a jury's finding on a single factual issue: The defendant did or did not possess a firearm (*Cooper*) or personally use the specified weapon (*Henley, Arnold*). In *Cooper,* since the parties had stipulated that the defendant was a felon, the jury's acquittal on the charge of possession of a firearm by a felon necessarily meant the jury found the evidence insufficient to prove he possessed a firearm; in *Henley* and *Arnold,* the juries' not-true findings necessarily meant they did not find the evidence sufficient to prove personal weapon use beyond a reasonable doubt. In each case, the trial court's finding that the defendant did possess or

---

[13] *Strong* disapproved *Allison* to the extent the latter held that a jury's special circumstances findings always foreclose relief under section 1172.6, even if the findings were made prior to *Banks* and *Clark.* (*Strong, supra,* 13 Cal.5th at p. 718 & fn. 3.)

personally use the weapon was directly contrary to the jury's finding on precisely the same issue.

In the present case the jury found the evidence insufficient to prove beyond a reasonable doubt that Lopez-Barraza was guilty of conspiracy to commit robbery, an offense consisting of several elements and therefore requiring the jury to consider several factual issues. As the jury was instructed, the crime of conspiracy "has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163.) Because a jury must find *all* the elements established to convict, acquittal does not necessarily demonstrate which element or elements the jury found not sufficiently proven. The People argue that "[b]ecause 'it is impossible to know exactly why a jury found a defendant not guilty on a certain charge,' the jury 'cannot be said to have "necessarily rejected" any facts when it returns a general verdict of not guilty.' " (*People v. Prock* (2014) 225 Cal.App.4th 812, 819, quoting *United States v. Watts* (1997) 519 U.S. 148, 155 (*Watts*).)[14]

_____

[14] Lopez-Barraza maintains that the quoted language from *Prock* "could effectively read the double jeopardy clauses out of the state and federal constitutions, as it suggests a prior acquittal can never bar relegation [*sic*] of an issue implicitly rejected by the jury," and suggests its reliance on *Watts* was misplaced because *Watts* held only that acquittal on a beyond a reasonable doubt standard does not preclude a subsequent finding by a preponderance of the evidence at sentencing. *Prock* and *Watts* were making the well-established point that " 'acquittal on criminal charges does not prove that the defendant is innocent' " but " 'merely proves the existence of a reasonable doubt as to his guilt.' " (*Watts*, *supra,* 519 U.S. at p. 155; *Prock,*

The People see *People v. Santamaria* (1994) 8 Cal.4th 903 (*Santamaria*) as demonstrating "why *Cooper*'s analysis is incorrect" and the conspiracy acquittal did not preclude the trial court's findings. In *Santamaria*, a jury convicted the defendant of murder and robbery and found a robbery-murder special circumstance true, but found not true an allegation that the defendant personally used a knife. (*Id.* at p. 909.) After the judgment was reversed on appeal, the defendant was charged with the same offenses, but without the weapon enhancement allegation. (*Ibid.*) The trial court ruled that the prosecution was precluded from retrying the defendant on the theory that he personally used a knife during the killing, and that it would instruct the jury that the defendant did not use a knife. (*Id.* at p. 909.) Affirming, the Court of Appeal held that the not-true finding at the first trial precluded the prosecution from retrying the defendant on the theory that he personally killed the defendant with a knife. (*Id.* at p. 910.)

The Supreme Court reversed, finding two requirements of the collateral estoppel doctrine had not been met.[15] (*Santamaria, supra,* 8 Cal.4th at pp. 917-923, 927.) The People rely on *Santamaria*'s analysis and holding that the issue to be determined at retrial was not identical to any issue necessarily decided by the jury's verdict of acquittal on the knife use enhancement. (*Id.* at p. 917.) To find the enhancement true, the jury was required to find beyond a reasonable doubt that the defendant personally

_____

*supra,* 225 Cal.App.4th at p. 819; *People v. Coley* (2012) 55 Cal.4th 524, 554 [listing cases].) Neither case is exceptional in this regard.

[15] *Santamaria* analyzed the issue assuming the doctrine of collateral estoppel applied in a retrial, without resolving whether the doctrine, like the double jeopardy doctrine from which it derives, is limited to successive prosecutions. (*Santamaria, supra,* 8 Cal.4th at p. 916.)

used the knife, but the defendant could be found guilty of murder as an aider and abettor without having personally used the knife. (*Id.* at p. 918.) Moreover, since a jury is not required to agree unanimously on the theory of murder, the not-true finding on the enhancement did not necessarily mean the jury concluded the defendant was an aider and abettor: The not-true finding "shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a knife. *It does not show the reverse, that the jury specifically found defendant was an aider and abettor. . . .* The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played.*" (*Id.* at p. 919.) Because the jury did not necessarily make a finding that the defendant *did not* personally use a knife, the prosecution was not precluded from proving at the second trial that he did personally did so.[16]

The People's only explanation for their assertion that the circumstances of the present case are "controlled by *Santamaria*" is that "the court's task at the evidentiary hearing was to determine beyond a reasonable doubt whether [Lopez-Barraza] committed the substantive offense of murder, not whether [he] conspired to commit robbery." Lopez-Barraza responds that *Santamaria*'s rationale does not apply because the jury in the present case

---

[16] The second requirement the court found missing in *Santamaria* was that "the issue to be foreclosed be of 'ultimate fact' "—an issue that "had to be proven beyond a reasonable doubt for [the defendant] to be found guilty of [the offense] no matter what the rest of the evidence showed." (*Santamaria, supra,* 8 Cal.4th at p. 921, quoting *Ashe v. Swenson* (1970) 397 U.S. 436, 443 (*Ashe*).) Knife use was an ultimate fact as to the enhancement—it had to be proven for the enhancement allegation to be found true—but was "not an ultimate fact of *murder.*" (*Santamaria,* at p. 921.)

"was not presented with alternate legal theories of [his] liability for murder" and instead was presented with "only one path to guilt—felony murder."

Neither of these points is helpful, as both focus on the substantive offenses and not on what underlying facts the jury necessarily found. *Santamaria* held the jury's verdict did not limit the prosecution's theory of murder on retrial because the verdict did not indicate the jury necessarily rejected the evidence on a specific factual issue—whether the defendant personally used a knife. (See *People v. Harrison* (2021) 73 Cal.App.5th 429, 441 [acquittal necessarily demonstrating reasonable doubt on specific issue preclusive on that issue in § 1172.6 resentencing proceeding]; *Arnold, supra*, 93 Cal.App.5th at p. 388 [not-true finding showing reasonable doubt on specific issue preclusive on same issue in § 1172.6 resentencing].) The court's summary of its decision reflects concern with fairness to the prosecution where a defendant is being retried for the same offense due to procedural errors at the first trial: The court explained that the first jury found the defendant guilty of murder despite having reasonable doubt as to whether he was the actual perpetrator or an aider and abettor, and the prosecution should not be denied the opportunity to prove his guilt under either or both theories on retrial.[17]

_____

[17] The *Santamaria* court summarized its conclusion: "The first jury, having heard and considered all the evidence, properly convicted defendant of murder even though it had a reasonable doubt who actually wielded the knife. The second jury should be allowed to do the same. A reasonable doubt that defendant used the knife precluded the use enhancement; it did not prevent conviction of murder at the first trial on the combined theory that he *either* used the knife *or* aided and abetted the one who did. It should not preclude conviction at retrial on the same basis. Transforming a conviction into an effective acquittal because of the fortuity of an intervening reversal, as happened here, violates the mandate of *Ashe, supra*, 397 U.S. at page 444,

25

The circumstances of the present case are entirely different. The determinations a resentencing court is required to make under section 1172.6 are meant to " 'give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined.' " (*People v. Farfan, supra,* 71 Cal.App.5th at p. 947.) The parallel between changes to existing law on liability for murder under sections 188 and 189 and the resentencing provisions " 'reflects an intent that sentences imposed on individuals with the same criminal history be the same, regardless of whether they are being sentenced or resentenced.' " (*Cooper, supra,* 77 Cal.App.5th 415.) In other words, section 1172.6 envisions that defendants entitled to resentencing will be subject to the same liability requirements as they would face if being tried for the first time under the new law—which requires the resentencing court to consider issues that were not relevant under prior law and therefore not decided. Because section 1172.6 is not meant to provide for *relitigation* of issues that *were* decided at the prior trial, however, the resentencing court is precluded from deciding the new issues based on factual findings that are inconsistent with facts *necessarily* found by the jury.

As our Supreme Court has stated with respect to the effect of a jury's special circumstance finding on the defendant's ability to state a prima facie

---

that collateral estoppel be applied with 'realism and rationality.' " (*Santamaria, supra,* 8 Cal.4th at p. 926.) The court described the situation as the opposite of *Ashe,* in which "the prosecution was given one fair opportunity to prove the defendant was one of the robbers; it failed, and was not entitled to try again. Here, the prosecution *did* prove to the jury's satisfaction that defendant was guilty. It should be allowed to do so again following reversal on appeal. To require the prosecution to specifically prove defendant was the aider and abettor, and *not* the knife user—which it did not have to prove to obtain the first conviction—would deny it that fair opportunity to prosecute defendant." (*Santamaria,* at p. 926.)

case for relief under section 1172.6, "[F]actual findings should be given preclusive effect. The point . . . is to identify *what those factual findings are* and how they relate to the elements of murder under a valid theory." (*Curiel, supra,* 15 Cal.5th at p. 470, italics added.) "To decipher what a jury has necessarily decided, . . . courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' ([*Ashe, supra,* 397 U.S. at p.] 444.) . . . [T]he inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' (*Ibid.*)" (*Yeager v. United States* (2009) 557 U.S. 110, 119-120.)

Here, the trial court found the evidence proved beyond a reasonable doubt that Lopez-Barraza participated in the planning and preparation for the armed robbery. This finding necessarily entails a conclusion that Lopez-Barraza was aware of what was being planned, and the trial court expressly so found. Lopez-Barraza argues the jury's finding that the evidence did not prove his guilt of conspiracy beyond a reasonable doubt necessarily entailed a determination that the evidence did not prove beyond a reasonable doubt that he participated in planning and preparing for the robbery, because if the jury found the evidence proved beyond a reasonable doubt that he was aware of the plan and participated in preparing for it, it could not have found him not guilty of conspiracy.

The People's position, that the acquittal shows only that all the elements of conspiracy were not established beyond a reasonable doubt without revealing what element or elements the jury found insufficiently proven, is not persuasive in the particular circumstances of this case. The

27

jury was instructed that the prosecution had to prove Lopez-Barraza "intended to agree and did agree with another member of the conspiracy to commit robbery, [and that] [¶] at the time of the agreement, [Lopez-Barraza] and the other alleged member of the conspiracy intended that one or more of them would commit robbery." Counsels' closing arguments made clear that the question whether Lopez-Barraza was guilty of conspiracy turned on what he knew, intended and agreed to before the group arrived at Carniceria Contreras.

The prosecutor argued that Lopez-Barraza's knowledge of the planned robbery, agreement to participate and intent to participate could be inferred from the evidence of multiple phone calls between Lopez-Barraza, Ramon, Fernando and Mejias; the evidence that Lopez-Barraza was in Sonoma on the days prior to the murder; the cell phone data showing Lopez-Barraza's phone in the vicinity of Starbucks around the time of the meeting on October 5 and in the vicinity of Carniceria Contreras around the time of the murder; Velasquez's testimony that Fernando and Ramon spoke in front of Lopez-Barraza about past robberies, that they made money by "get[ting] marijuana from people," and that Lopez-Barraza, Fernando and Ramon armed themselves and left together on the morning of the murder; and the evidence that Lopez-Barraza concealed himself behind the building with Fernando.

Defense counsel's closing argument emphasized questions about whether Lopez-Barraza knew beforehand that the plan was to rob de Jesus rather than to buy drugs from him. Counsel relied heavily on the jury instructions on circumstantial evidence, particularly the instruction that if two or more reasonable conclusions can be drawn from circumstantial evidence, one pointing to guilt and another to innocence, the jury must accept the one pointing to innocence. Counsel argued that the phone calls were not

28

necessarily about planning a robbery and Lopez-Barraza had other reasons to talk to his cousins, including discussing his brother's arrest and making plans to go to Santa Rosa to get his brother's belongings; Mejias and Velasquez were not credible witnesses (Mejias because he was motivated to point the blame at others and Velasquez because of her history of lying to the police in this case and in the past); the evidence was consistent with Lopez-Barraza not being armed; even if he was armed, it did not mean he was part of a planned robbery rather than a plan to purchase a significant quantity of marijuana, an inherently dangerous enterprise for which it was reasonable to infer the participants would have wanted to be prepared; and that his conduct after the shooting was consistent with his being a shocked and panicked witness, a "flunky" going with his cousins, who were in charge.

In rebuttal, the prosecutor argued it was not reasonable to believe Lopez-Barraza was "the flunky cousin who didn't know what was happening." But the prosecutor also suggested a view of the evidence that would result in the verdict the jury in fact reached—guilty of robbery and felony murder but not guilty of conspiracy. The prosecutor argued, "an interesting way you could approach this is for some reason you believe [Lopez-Barraza] didn't know about the agreement, wasn't part of the conspiracy, but found out about the robbery the day of the robbery or the moment that they drove up to the carnicera [sic], and he meant to participate in the robbery because he does. He comes out of that carnicera armed, participates by grabbing the pot, commits that robbery in concert with Fernando. He is still guilty of robbery. He is still guilty of felony murder as a principal in the robbery. He is just not guilty of conspiracy to [commit] robbery. So if he formed that intent to participate or aid and abet in that robbery behind the building or walking out with Fernando armed, he is guilty. And I submit to you, he participated in

29

that robbery. He sees Fernando with a gun out at the victim. That is not a happy buy/sell relationship going on there. So for some reason you find he didn't know before he got to the carnicera, he is still guilty."

Depending on the jury's evaluation of the witnesses' credibility, particularly that of Velasquez and Mejias, the jury could have concluded that Lopez-Barraza decided to participate in the robbery at the scene but entertained a reasonable doubt whether he was aware of the plan to rob de Jesus beforehand or thought he was participating only in a drug deal that had potential to present danger. It could have had a reasonable doubt whether he was aware of any specific purpose for going to Carniceria Contreras. It could even have had a reasonable doubt whether there was a conspiracy to commit armed robbery at all. But given the record in this case, the acquittal necessarily means the jury did not find the evidence sufficient to prove that Lopez-Barraza, before the fact, was aware of a plan to commit armed robbery, agreed to the plan and intended to commit this offense. It could not have had such doubt if it found the evidence sufficient to prove beyond a reasonable doubt that Lopez-Barraza was aware beforehand that Fernando and Ramon were planning an armed robbery and participated in planning and preparing for it.

We fail to see how the trial court's finding that Lopez-Barraza "participated in some fashion at virtually every step of the planning and preparation stages of the *armed robbery*" can be reconciled with the jury's verdict. (Italics added.) As we have said, this finding necessarily encompasses a finding that the evidence proved Lopez-Barraza knew the purpose of the plan was armed robbery (i.e., not just a drug deal) well before the events at the scene. The court expressly found that Lopez-Barraza had "full awareness" of a plan to rob de Jesus at least by the time of the

30

Starbucks meeting, discussed plans for an armed robbery with his co-participants in phone calls on October 5 and 6, loaded firearms with the others "before leaving for the Carniceria to commit a robbery of marijuana," and "knowingly" acted in coordination with the others to "complete an armed robbery." The finding that Lopez-Barraza *participated* in planning and preparing for the offense necessarily entailed a determination that he did so together with Ramon and Fernando and therefore that he reached some form of agreement with them as to commission of the robbery.

The trial court's finding that, beyond a reasonable doubt, Lopez-Barraza knowingly participated from the outset in planning and preparing for an armed robbery is directly contrary to the jury's determination that the evidence did not prove beyond a reasonable doubt he "intended to agree and did agree with another member of the conspiracy to commit robbery," [and that] [¶] at the time of the agreement, [Lopez-Barraza] and the other alleged member of the conspiracy intended that one or more of them would commit robbery." As in *Cooper,* the trial court in this case considered the same evidence as the jury and applied the same beyond a reasonable doubt standard to find a fact the jury found unsupported by the evidence, thus "effectively turn[ing] [Lopez-Barraza's] acquittal 'into [its] opposite[].' " (*Cooper, supra,* 77 Cal.App.5th at p. 417, quoting *Arevalo, supra,* 244 Cal.App.4th at p. 853; *Henley, supra,* 85 Cal.App.5th at p. 1020.)

We conclude that *Cooper*'s analysis applies here and compels the conclusion that the trial court erred in basing its decision on its view that

Lopez-Barraza participated in planning and preparing for the armed robbery of de Jesus.[18]

## C. The Error Was Not Harmless.

We recognize that this finding was not the *only* basis for the trial court's determinations that Lopez-Barraza was a major participant in the robbery and acted with reckless indifference to human life. The People urge us to find any error in reliance on the evidence of planning harmless, arguing there is no reasonable probability the outcome would have been different if the trial court had not considered this evidence.

Like the courts in *Cooper* and *Henley,* we will assume, without deciding, that the applicable standard for prejudice is that of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Cooper, supra,* 77 Cal.App.5th at p. 417; *Henley, supra,* 85 Cal.App.5th at p. 1020.) *Cooper* found the trial court's

---

[18] As we have indicated, the Supreme Court has now made clear that principles of issue preclusion (collateral estoppel) should ordinarily be applied to determine whether a jury's findings at trial will be binding in section 1176.2 proceedings. (*Strong*, *supra*, 13 Cal.5th at p. 715 ["[T]he structure of the statute [Senate Bill 1437]—which permits trial courts to consult the record of conviction to determine whether the defendant has made out a prima facie case of eligibility [citation], and which notably does not open resentencing to every previously convicted murder defendant— strongly suggests the Legislature contemplated that many, and perhaps most, such findings would be given effect on resentencing"]; *Curiel, supra*, 15 Cal.5th at p. 460 ["Senate Bill 1437 does not itself support an equitable exception to issue preclusion. To the contrary, issue preclusion will 'ordinarily' apply in such proceedings"].) Although *Strong* and *Curiel* discussed issue preclusion in the context of findings made in favor of the People, the People do not argue or suggest any reason the same principles should not be applied to findings made in favor of a defendant. Nor do they contend that the analysis applied in *Strong* and *Curiel* would produce a different result here. The People do not argue that the application of the issue preclusion principles in *Strong* and *Cooper* would produce a different outcome, and we do not therefore address the issue.

error in relying on its finding that the defendant possessed and fired a gun was prejudicial, despite this not being the only evidence supporting its denial of the petition, because the finding was "crucial" to the trial court's decision. (*Cooper,* at p. 418.) *Cooper* observed that "[u]nder *Banks* and *Clark,* a defendant's knowledge of the presence of weapons, personal possession of a weapon, and actual use of a weapon are all highly relevant to whether the defendant was a major participant who acted with reckless indifference to human life." (*Id.* at pp. 417-418.) The defendant had been convicted of kidnapping and felony murder; there was "strong evidence" he participated in the kidnapping, "but it was far less clear whether and to what extent he participated in the actual murder." (*Id.* at p. 400.) The *Cooper* court explained that if the defendant fired a gun during the kidnapping or the murder, it would be strong evidence that he acted with reckless indifference to human life, and if he was the person seen throwing one or more guns off a bridge, it would be "key evidence" that he knew the victim had been murdered and tried to cover it up. (*Id.* at p. 418.) Finding it was reasonably probable the trial court would not have denied relief if it had not found the defendant possessed and fired a firearm, *Cooper* remanded for a new hearing. (*Ibid.*)

The analysis in *Henley* was much the same. The trial court's finding that the defendant used a firearm during the underlying robbery, contrary to the jury's not-true finding on an alleged personal use enhancement, was not the only evidence supporting denial of the section 1172.6 petition, it was "crucial" to the determination that the defendant was a major participant who acted with reckless indifference and "one of the most important facts on which [the court] based its determination that [the defendant] was not entitled to relief." (*Henley*, *supra,* 85 Cal.App.5th at pp. 1020, 1021.) *Henley*

33

explained, "For example, in the court's written order, it mentioned twice that Henley was 'armed with a firearm.' The court also emphasized that Henley, while armed, threatened the two employees in Taco Bell with 'immediate death' and displayed the firearm 'in a threatening manner.' Thus, it is clear from the court's order that it believed the fact Henley was armed was strong evidence that she acted with reckless indifference to human life." (*Id.* at p. 1020.) Stating that it could not say "it would not be reasonably probable that the court would not have denied Henley relief had it not found that she possessed and used a firearm during the robbery," *Henley* reversed and remanded for a new hearing. (*Ibid.*)

*Arnold* also remanded for a new hearing after concluding the resentencing court erred in finding the defendant stabbed the victim when the jury had found a personal knife use enhancement not true. (*Arnold, supra,* 93 Cal.App.5th at pp. 390-391.) The People argued that the trial court's decision was independently supported by its alternate finding that the defendant acted with implied malice. (*Id.* at p. 390.) *Arnold* rejected this argument because the "bulk of the order is dedicated to a detailed analysis of the determination that defendant was the actual killer because he stabbed the victim" and the trial court's "brief[]" discussion of implied malice "suggest[ed] that the malice finding was substantially based on the assumption that the defendant stabbed the victim." (*Ibid.*)

Here, as described earlier, the court considered each of the factors identified in *Banks* and *Clark,* and discussed Lopez-Barraza's conduct and state of mind at the scene of the murder and afterward as well as beforehand. But it is clear from the court's decision as a whole that its belief that Lopez-Barraza knowingly participated in "virtually every step of the planning and preparation stages of the armed robbery" was highly significant to the court's

34

analysis. The court expressly stated its finding that Lopez-Barraza was involved throughout the planning and preparation for an armed robbery in its discussion of the first factor described in *Banks,* the defendant's role in the offense, but it is also reflected in the court's findings on other factors. For example, with respect to Lopez-Barraza's role in supplying or using lethal weapons, the court inferred that he had his own loaded firearm at the scene, and knew Ramon and Fernando were armed, from the evidence that they loaded the firearms "before leaving for the Carniceria to commit a robbery of marijuana." The court found Lopez-Barraza was aware of the dangers of the offense in part because "this was a planned armed robbery of a person who was intending to sell a large amount of marijuana that was worth a sizeable amount of money." Regarding whether Lopez-Barraza was in a position to facilitate or prevent the murder, the court noted that when the three men were loading their firearms before leaving for the Carniceria, Lopez-Barraza never suggested "an alternative plan" of confronting de Jesus with unloaded firearms.

The court's reliance on Lopez-Barraza's involvement in planning the armed robbery is similarly reflected in its analysis of whether he acted with reckless indifference. As to knowledge and use of weapons, the court again relied on its findings that Lopez-Barraza was armed with a loaded firearm and knew Fernando and Ramon were as well, and "the plan was to commit an armed robbery with loaded firearms, that were loaded at the home before [Lopez-Barraza] and his cohorts left for the scene of the robbery." In finding Lopez-Barraza had an opportunity to lessen the risks of the armed robbery, the court again found that he failed to suggest that the three men, or at least Fernando, use unloaded firearms in the robbery.

35

The People's harmless error argument analyzes the *Banks* and *Clark* factors and concludes they are satisfied even without consideration of Lopez-Barraza's involvement in planning and preparing for the armed robbery. They maintain the evidence shows Lopez-Barraza was a major participant because he was armed and knew Ramon and Fernando were armed, he voluntarily participated in what he knew would be an armed robbery of a drug dealer, he was aware of Fernando and Ramon's violent conduct in prior robberies, he was at the scene and actively participated in the robbery by acting in concert with Fernando to surprise and intimidate de Jesus with the threat of lethal force, moved marijuana from de Jesus's car to Ramon's while Fernando confronted de Jesus, did nothing to aid de Jesus after he was shot, fled with his coparticipants and tried to conceal and evade capture by renting motel rooms for himself and Fernando under an alias. The People contend the trial court did not consider Lopez-Barraza's planning in finding he acted with reckless indifference because the factors bearing on this question do not expressly include participation in planning.

The cases cited by the People affirmed special circumstance findings made prior to *Banks* and *Clark* after determining that substantial evidence in the record supported finding the defendant was a major participant and acted with reckless indifference based on the factors identified in the new decisions. (*In re Loza* (2017) 10 Cal.App.5th 38, 41-42; *People v. Douglas* (2020) 56 Cal.App.5th 1, 6, 8-11; *People v. Medina* (2016) 245 Cal.App.4th 778, 791-792.) They did not consider or decide whether a trial court's reliance on an improper factor in denying a section 1170.6 petition can be found harmless.

We agree that *some* of the trial court's findings *could* be reached without considering Lopez-Barraza's participation in planning the robbery—

36

specifically, its findings that Lopez-Barraza's conduct at the scene and after established his intentional participation in the robbery at the time it was actually committed. The question for our harmless error analysis, however, is whether, absent consideration of Lopez-Barraza's role in planning and preparation, there is a reasonable probability the court would have found the evidence of Lopez-Barraza's participation in the robbery *insufficient* to demonstrate beyond a reasonable doubt that he was a *major participant* who acted with *reckless indifference*. To find he was a major participant, the trial court had to find beyond a reasonable doubt that his personal role was " 'substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder.' " (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 238, quoting *Banks, supra,* 61 Cal.4th 788, 802.) To find reckless indifference, the court had to find beyond a reasonable doubt that Lopez-Barraza was " ' "aware of and willingly involved in the violent manner in which the particular offense is committed" ' " and " 'consciously disregard[ed] "the significant risk of death his or her actions create[d]." [Citations.]' " (*Madrigal*, at p. 238, quoting *In re Scroggins, supra,* 9 Cal.5th 667, 677.) A defendant's role in planning the offense is a significant factor in analyzing both issues. (*Banks,* at p. 805 [finding defendant not a major participant in part because no evidence of role in planning robbery]; *In re Scroggins,* at p. 677 [finding evidence did not show reckless indifference in part because defendant planned *unarmed* assault and robbery and did not know coparticipant would use gun].)

Here, as described above, the influence of the trial court's finding that Lopez-Barraza participated "at virtually every step of the planning and preparation stages of the armed robbery," knowing the plan was for an armed robbery, is evident throughout its order. The court's heavy reliance on this

factor demonstrates it was "crucial" to the court's analysis. (*Cooper, supra,* 77 Cal.App.5th at p. 418; *Henley, supra,* 85 Cal.App.5th at p. 1020.) For that reason, there is a reasonable probability the trial court would have granted Lopez-Barraza relief absent this finding. (*Henley,* at p. 1020.) Accordingly, we will reverse and remand for a new evidentiary hearing at which the trial court shall not rely on evidence admitted at trial that contradicts the jury's verdict, which established that the evidence at trial did not prove beyond a reasonable doubt that Lopez-Barraza "intended to agree and did agree with another member of the conspiracy to commit robbery, [and that] [¶] at the time of the agreement, [Lopez-Barraza] and the other alleged member of the conspiracy intended that one or more of them would commit robbery." (See *Henley,* at p. 1021; *Cooper,* at p. 419.) We express no opinion as to Lopez-Barraza's ultimate entitlement to relief. (*Arnold, supra,* 93 Cal.App.5th at p. 391, fn. 8.)

## DISPOSITION

The order denying Lopez-Barraza's petition is reversed. The matter is remanded to the trial court for a new hearing to determine whether the prosecution has proved, beyond a reasonable doubt, that Lopez-Barraza was a major participant in the robbery and acted with reckless indifference to human life. The trial court shall not rely on any evidence admitted at trial that contradicts the jury findings necessarily encompassed by its verdict acquitting Lopez-Barraza of conspiracy.

STEWART, P. J.


We concur.


RICHMAN, J.


MILLER, J.


*People v. Lopez-Barraza* (A168604)

Trial Court:  Sonoma County Superior Court

Trial Judge:  Hon. Dana B. Simonds

Counsel:

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Bridget Billeter, Julia Y. Je and Benjamin B. Bonnello, Deputy Attorneys General, for Plaintiff and Respondent.